UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION

JOHN MOORE, *AS THE ADMINISTRATOR*                                    PLAINTIFF
*OF THE ESTATE OF MARY OPAL*
*MOORE*,

v.                                                                   No. 5:21-cv-107-BJB

THE CINCINNATI CASUALTY COMPANY                                      DEFENDANT

\* \* \* \* \*

MEMORANDUM OPINION & ORDER

This is the second time this claim has come before this Court.  John Moore, as administrator of his mother Mary Opal Moore's estate, sued Cincinnati Casualty Company for bad faith under Kentucky's Unfair Claims Settlement Practices Act.  In the first iteration, the Estate alleged that Cincinnati Casualty engaged in bad faith by failing to respond to settlement requests and failing to accurately disclose policy limits.  These allegations derived from an underlying suit against Cincinnati Casualty's insured, Superior Care Homes, which evicted Ms. Moore shortly before her death.  The Estate made several settlement offers ranging from $395,000 to $2 million.  But Cincinnati Casualty never responded and a jury returned a verdict for $2.2 million.  The Court dismissed the bad-faith claim without prejudice on multiple grounds, including the lack of actual damages caused by any bad faith since the jury verdict was substantially higher than any settlement offer.

The Estate refiled.  Cincinnati Casualty moved to dismiss on similar grounds and added that a consent provision required the insured to consent to any settlement first.  Since there was no consent, Cincinnati Casualty couldn't have settled and its refusal to do so couldn't be bad faith.  The Estate moved to amend its complaint with allegations that Cincinnati Casualty misrepresented and failed to disclose this consent provision.  But none of these new allegations indicated that the consent provision did not apply or that the insured consented.  In fact, they acknowledged the opposite was true.  Amended Complaint (DN 9-1) ¶¶ 61–62; *see also* MTD Response (DN 10) at 6.  And through all of these complaints, the Estate still never pled actual damages caused by Cincinnati Casualty's bad faith.  So the Court denies the Motion to Amend (DN 9) as futile and grants the Motion to Dismiss (DN 4) with prejudice.

1

## I.   Allegations & Procedural History

According to the Amended Complaint, which the Court accepts as true at this stage, Mary Opal Moore was admitted to Superior Care Homes in 2014.  Am. Compl. ¶ 5.  She suffered from Alzheimer's, which caused her to act aggressively toward other residents.  ¶¶ 7, 9.  In March 2015, Superior failed to provide physician-ordered care and then improperly evicted her.  ¶¶ 10, 18.  About four weeks later, after suffering relocation stress and intestinal bleeding, Ms. Moore passed away.  ¶¶ 27–29.  Her son and the administrator of her Estate, John Moore, sued Superior in state court for mistreatment.  ¶¶ 1, 51.  The Estate alleges that Superior admitted to violating several state and federal regulations in connection with Ms. Moore's care.  ¶¶ 31–34.  Superior did not appeal these findings.  ¶¶ 35–36.

The defendant, Cincinnati Casualty Company, insured Superior under a Health Care Facility Professional Liability policy and provided Superior with counsel.  ¶¶ 38, 53–54.  The Estate alleges that defense counsel initially failed to disclose this policy and later misrepresented it.  ¶¶ 58–64.  Eventually, Superior's lawyer provided the Estate with a copy of a policy, which had a limit of $1 million per medical incident and an aggregate limit of $3 million.  ¶ 60.  The Estate also alleged that Cincinnati Casualty failed to respond to, or even acknowledge, its settlement request of $395,000.  ¶¶ 65, 67.

As a result, the case went to trial in McCracken Circuit Court.  ¶¶ 67–68.  Near the end of the trial, the Estate learned that the policy limit was actually $2 million.  ¶ 72.  One day before the verdict came in, the Estate offered to settle for $2 million; the next day, just before the verdict arrived, the Estate demanded $1 million, based on another alleged misrepresentation regarding the policy's limits.  ¶¶ 73–75.  Cincinnati Casualty didn't respond to either request before the jury returned its verdict: $2.2 million in damages, $1,625,000 of which was punitive.  ¶¶ 76, 80.  Superior didn't appeal.

Following the resolution of the state-court case against the nursing home, the Estate filed another lawsuit, this time against Cincinnati Casualty for bad faith under Kentucky's Unfair Claims Settlement Practices Act.  ¶¶ 81–82; KRS § 304.12-230.  The Estate alleged that Cincinnati Casualty acted in bad faith by failing to engage in settlement negotiations despite knowing Superior was liable.  The Estate later amended its complaint to allege that Cincinnati Casualty also failed to disclose the policy limits.  The case was removed to federal court and Cincinnati Casualty quickly moved to dismiss.  Am. Compl. ¶¶ 81–82.  This Court granted the motion to dismiss without prejudice on several grounds: (1) no actual damages existed, (2) Cincinnati Casualty had a reasonable basis to deny the claim, and (3) the conduct wasn't outrageous.  *Moore v. Cincinnati Cas. Co.*, No. 5:20-cv-148, 2021 WL 666966, at *3–6 (W.D. Ky. Feb. 19, 2021).  The Estate subsequently filed this substantially similar complaint.  DN 1.

## II.   Kentucky Unfair Claims Settlement Practices Act

The Estate's suit asserts a single bad-faith claim under Kentucky's Unfair Claims Settlement Practices Act.  KRS § 304.12-230.  The Act prohibits insurance companies from engaging in unfair claim-settlement practices, including unreasonable investigation, settlement, and explanation for the denial of claims.  *Id.*  This is straightforward enough when the plaintiff is the insured.  When a third-party sues an insurer that didn't cover the plaintiff, the required showing is more complicated.  A plaintiff needs to show:

> (1) the insurer must have been obligated to pay the claim under the terms of the policy;
>
> (2) the insurer must have lacked a reasonable basis in law or fact for denying the claim; and
>
> (3) the insurer must have known that no reasonable basis existed for denying the claim or else acted with reckless disregard for any such basis.

*Hollaway v. Direct Gen. Ins. Co. of Mississippi, Inc.*, 497 S.W.3d 733, 737–38 (Ky. 2016) (quoting *Wittmer v. Jones*, 864 S.W.2d 885, 890 (1993)).  The final element requires proof that the insurer's "conduct was outrageous and caused the plaintiff actual damage."  *Mosley v. Arch Specialty Ins. Co.*, 626 S.W.3d 579, 588 (Ky. 2021).  These elements, as the Kentucky Supreme Court unanimously held not long after this Court's dismissal of the initial Moore bad-faith suit, imposes a "steep burden" on plaintiffs.  *Id.* at 584.

Cincinnati Casualty moved to dismiss on every element for the same reasons it advanced in the first case.  MTD at 13–17.  In addition, Cincinnati Casualty argued res judicata and asserted it was not obligated to pay due to a provision requiring consent to settle, which Superior Care never provided.  *Id.* at 6–9, 12–13.[1]

In response to the motion to dismiss, the Estate moved to amend the complaint with allegations that Cincinnati Casualty failed to disclose and misrepresented the presence of a consent provision as additional evidence of outrageous conduct.  Motion to Amend (DN 9); Am. Compl. ¶¶ 60–65.  Cincinnati Casualty responded by arguing that the amendment was futile since the changes were minor and focused on unactionable discovery disputes.  Cincinnati Casualty Response (DN 12) at 2–6.  Typically, leave to amend should be "freely" given.  FED. R. CIV. P. 15(2).  But a motion

---

[1] Cincinnati Casualty's res judicata argument that the last case was decided "on the merits" fails.  That dismissal, like many Rule 12(b)(6) dismissals, was without prejudice.  MTD at 6–9.  While it is true that dismissals for failure to state a claim are "on the merits" and may be with prejudice, a court can choose to dismiss without prejudice.  *Craighead v. E.F. Hutton & Co.*, 899 F.2d 485, 495 (6th Cir. 1990).  That allows a plaintiff to "return[] later, to the same court, with the same underlying claim."  *Arangure v. Whitaker*, 911 F.3d 333, 347 (6th Cir. 2018) (quotation omitted).

to amend "should be denied if the amendment . . . would be futile." *Crawford v. Roane*, 53 F.3d 750, 753 (6th Cir. 1995).

"A proposed amendment is futile if the amendment could not withstand a Rule 12(b)(6) motion to dismiss." *Rose v. Hartford Underwriters Ins. Co.*, 203 F.3d 417, 420 (6th Cir. 2000). And "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Courts must accept factual allegations, but not legal conclusions, as true. *Id.* Since the standards are the same and the amended complaint bolsters (rather than meaningfully alters) the original, *see* MTA Response (DN 12) at 2, the Court will evaluate the amended complaint.

Because the amendment is futile, the Court grants the motion to dismiss for two reasons: the consent provision meant Cincinnati Casualty was not obligated to pay, and the Estate still fails to plead actual damages.

## A. Cincinnati Casualty was not obligated to pay the Estate absent Superior's consent

The first element of a bad-faith claim asks whether the insurer was obligated to pay the claim in the first place. *Hollaway*, 497 S.W.3d at 737–38. A policy exclusion that would exclude coverage for a particular type of claim or defendant, for example, would defeat the insurer's liability. *See, e.g., Mosely*, 626 S.W.3d at 585–86 (coverage exclusion for injuries to employees meant no bad-faith liability regarding such a claim). In the third-party context, where a tort plaintiff sues the tortfeasor's insurer, *see Moore*, 2021 WL 666966 at *1, the question is whether the insurer engaged in bad-faith behavior relative to a potential settlement between the plaintiff and the insured. But if a policy contains a consent provision that requires the insured to consent before the insurer can settle with a third party suing the insured, the insurer cannot be liable for refusing to negotiate or pay an unconsented settlement. *See Am. Physicians Assur. Corp. v. Schmidt*, 187 S.W.3d 313, 317–18 (Ky. 2006). "Where the insured retains the right to consent to settlement and withholds that consent, the insurer's failure to settle cannot be deemed 'bad faith' that would give rise to liability for an excess judgment." *Id.* The plaintiff's rights against the insurer are contingent on the liability of the insured and the insurer's obligation to cover any such liability. *Id.*

The same lack of consent defeats the Estate's claim here. The Amended Complaint acknowledges that Superior's counsel refused to negotiate a settlement because "the insurance policy covering the conduct was a 'consent policy' and that [the defendant] would not give consent to settle." Am. Compl. ¶¶ 61–62, 81; *see also* MTD Response at 6. The Estate even attached this provision to its complaint. Health

Care Facility Professional Liability Coverage Form (DN 9) Ex. 6 at 101.[2]   That provision clearly states that Cincinnati Casualty "will not settle or compromise any claim or 'suit' without the insured's written consent." *Id.*  The Estate never alleged that this policy was inapplicable, although at one spot it did contradict its other allegations and the terms of the attached policy by alleging that Cincinnati Casualty had the "sole authority to settle claims." Am. Compl. ¶ 41–42.  This ambiguous and contradictory assertion doesn't undermine the Estate's clearer and more specific allegation elsewhere, however, which has the added benefit of tracking the actual policy language the Estate supplied.  Despite this provision, however, the Estate didn't allege that the insured consented to settlement negotiations, much less to a specific settlement agreement or offer.  This defeats Cincinnati Casualty's obligation to pay under *Whittmer*'s first prong.

The Estate's principal counterargument is a sort of unclean-hands contention that "Cincinnati Casualty's retained attorney" had sometimes "misrepresented" and at other times "denied" the existence of such a provision. Am. Compl. ¶¶ 61–64.  But why would the Estate's mistaken belief that no such provision existed, ¶ 65, alter the reality that the insured's consent was necessary to create an obligation for the insurer to pay?  The Estate never says.

These allegations (even on their own terms) do not defeat the exclusion for at least two reasons.

First, just as in the previous case, the Estate attempts to attribute defense counsel's statements to Cincinnati Casualty because the insurer provided the attorney to defend its insured. *Moore*, 2021 WL 666966, at *2.  But retained counsel operating under a duty to defend still represent the insured, not the insurer. *See Am. Ins. Ass'n v. Kentucky Bar Ass'n*, 917 S.W.2d 568, 571 (Ky. 1996) (insurer's in-house counsel could and must represent insured, not the insurer); *Settles v. Owners Ins. Co.*, No. 2014-CA-001162-MR, 2015 WL 5095315, at *4 (Ky. Ct. App. Aug. 28, 2015) ("attorney's primary duty of loyalty lies with the insured, and not the insurer") (quotation omitted).  So any misrepresentations by defense counsel cannot be attributed to Cincinnati Casualty.

Second, even if the insurer misrepresented the policy to the Estate, that would not nullify the insured's right to decide whether to consent to any settlement.  The Estate alleges that "concealing…or misrepresenting" the consent policy is evidence of "outrageous conduct," not that the policy does not apply. Am. Compl. ¶ 90.  That may

---

[2] Without converting the motion to one for summary judgment, a court may consider "exhibits attached [to the complaint], public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the complaint and are central to the claims contained therein." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008).

matter for *Whittmer*'s third prong, but not its first. Whether the Estate should've had access to the consent provision sooner in the underlying litigation is beside the point. It demanded that information in discovery from Superior's lawyer, not Cincinnati Casualty. MTA Reply (DN 13) at 4. And in any event, this is not a factual dispute warranting discovery, as the Estate contends. *Id.* at 3. Such discovery disputes concern non-actionable "litigation tactics" and should have been resolved by the trial court. *Mosley v. Arch Specialty Ins. Co.*, 626 S.W.3d 579, 591–92 (Ky. 2021) ("[T]he Rules of Civil Procedure provide remedies for discovery abuses[.]"); *Knotts v. Zurich Ins. Co.*, 197 S.W.3d 512, 522 (Ky. 2006) (considering evidence of litigation tactics would disrupt judicial process and impede insurer's advocacy on behalf of insured).

Since the consent provision applies and Superior did not consent, Cincinnati Casualty could not have settled and thus could not have acted in bad faith.

## B. The Estate does not plead actual damages

As this Court's prior opinion explained, Kentucky bad-faith law and Article III of the U.S. Constitution both require a plaintiff to have suffered some injury before a federal court may adjudicate the dispute and award relief. 2021 WL 666966, at *4–5. For third-party bad-faith claims, this requires a plaintiff to allege that "[t]he insurer's conduct resulted in actual damage." *Mosley*, 626 S.W.3d at 588. The Estate's prior lawsuit did not: the jury awarded the Estate $2.2 million, which was more than the policy limit of $2 million and the initial settlement offer of $395,000. *Moore*, 2021 WL 666966, at *4. So the Estate would have been *worse* off if Cincinnati Casualty settled at the time and amount the Estate said it outrageously declined to do. *Id.* In an attempt to avoid this conclusion, the Estate argued for emotional damages and "litigation expenses incurred." *Id.* But an Estate cannot suffer emotional distress. *Id.* And for litigation costs, the amount accrued during the 46 days between the initial settlement offer and the verdict was $30,411, which is far less than the difference between the settlement offer and the eventual jury verdict of $2.2 million. *Moore*, 2021 WL 666966, at *5. Here, the Estate once again argues for "litigation expenses incurred" but now demands punitive damages rather than damages for the "emotional distress" purportedly suffered by the Estate. Am. Compl. ¶¶ 104–05; *Moore*, 2021 WL 666966, at *4 ("[T]he Estate itself cannot suffer emotional distress because it is not a natural person."). This changes nothing.

To begin, the Estate does not plead an amount for litigation costs. The most the Estate says is "extensive discovery" required the Estate "to expend significant funds, including costs of deposition transcripts, travel, expert witnesses' fees, and filing fees." Am. Compl. ¶¶ 56, 106. There is no allegation as to the time period or amount expended. *See Mosley*, 626 S.W.3d at 588 (plaintiff failed to assign an amount of actual damages caused by bad faith). Logically, most of these expenses would have occurred before the initial settlement offer of $395,000 in June 2019; the case was

more than two years old and had only two months left before the verdict.  Am. Compl. ¶¶ 51, 65.  Nothing in the new pleadings departs from the $30,411 figure discussed in the first case, which covered the period between the first settlement offer and the verdict—and which is substantially less than the increase in the apparent value of the claim from $395,000 to $2.2 million during those two months.  *See Mosley*, 626 S.W.3d at 588 (delay alone doesn't amount to an injury when an initial refusal to settle for policy limit was followed by a settlement for the same amount two weeks later).  Even if the Court considers the $2 million settlement demand, any damages associated with it would have had to arise during the *single day* separating that offer from the verdict.  Am. Compl. ¶ 73.  Nothing suggests that day cost the Estate more than $200,000.  Based on these allegations, it is impossible to see how the Estate could have been damaged by incurring litigation costs between its settlement offers and the massive jury verdict.

To the extent the Estate ascribes injury to Cincinnati Casualty's alleged policy misrepresentations, no allegations explain how such misrepresentations damaged the Estate.  Not to mention to what extent, or how these damages would differ from those ascribed to the refusal to settle.

The Estate's attempt to bolt onto its damages calculation 12% annual interest on all costs from the start of litigation likewise fails.  ¶¶ 101, 108.  The Estate has not alleged that Cincinnati Casualty was obligated to settle at the outset of the case, much less that it engaged in bad faith from the start.  Furthermore, the Estate derives this 12% number and duty from KRS 304.12-235, which does not apply to third-party bad-faith claims.  ¶ 107; *Motorists Mut. Ins. Co. v. Glass*, 996 S.W.2d 437, 455 (Ky. 1997); *Nichols v. Zurich Am. Ins. Co.*, 630 S.W.3d 683, 693 (Ky. 2021).  And even if the 12% were added to the $30,411 number, it would take years to reach the difference between $2.2 million and $395,000.  No matter which blocks it tries to stack, the Estate cannot construct an injury from bad faith that compares to its extremely successful jury verdict.

The Estate's only remaining basis is punitive damages.  Am. Compl. ¶ 105; MTD at 13.  But the Estate seems to conflate damages it can recover from a successful bad-faith claim with actual injury caused by the bad-faith conduct.  *Id.*  Punitive damages that may be awarded for proving a bad-faith claim are by definition not actual damages that can be used to prove the injury that stands as an element of the claim itself.  Cincinnati Casualty's alleged bad faith did not cause the Estate to *suffer* punitive damages.  If anything, Cincinnati Casualty's unwillingness to settle caused the Estate to *recover* more than a million dollars in punitive damages.  That previous compensation cannot serve as a current injury this Court could somehow remedy.

Thus the Estate is left without any actual damages caused by Cincinnati Casualty's alleged bad faith.[3]

### III.   Conclusion

Because the Estate's proposed *fourth* complaint failed to state a claim, the Court denies the Estate's Motion to Amend (DN 9) as futile.  The amended complaint could not survive a motion to dismiss, and neither could the original.  So the Court grants Cincinnati Casualty's Motion to Dismiss (DN 4) with prejudice.  *Pratt v. Ventas, Inc.*, 365 F.3d 514, 522–23 (6th Cir. 2004).

Benjamin Beaton, District Judge
United States District Court

August 18, 2022

---

[3] As in the first case, Cincinnati Casualty argues that it had a reasonable basis for believing its insured was not liable and also that its conduct was not outrageous.  Because the Court dismisses on other grounds, these arguments needn't be addressed.